## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JOHN DAVID GARCIA,

      Plaintiff,

vs.                                                                          No. CIV 08-0295 JB/WDS

THE UNITED STATES OF AMERICA and
BEN GARCIA,

      Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

**THIS MATTER** comes before the Court on: (i) a bench trial held on April 1, 2010 and April 7, 2010; (ii) Defendant United States of America's Proposed Findings of Fact and Conclusions of Law, filed May 26, 2010 (Doc. 64); and (iii) the Plaintiff's Proposed Findings and Conclusions, filed May 27, 2010 (Doc. 65).  The primary issues are: (i) whether Defendant Ben Garcia was acting within the scope of his employment as a police officer when he confronted Plaintiff John David Garcia at a wedding reception; (ii) whether B. Garcia negligently handled the situation with J. Garcia; and (iii) whether B. Garcia's alleged negligence caused J. Garcia's injuries.  The Court finds that, while B. Garcia was acting within the scope of his employment when he confronted J. Garcia, B. Garcia acted reasonably and not negligently, and is therefore not liable to J. Garcia. The Court thus concludes that, because B. Garcia did not tortiously cause J. Garcia's damages, the United States is not liable -- vicariously or otherwise -- for any of J. Garcia's damages.

## FINDINGS OF FACT

The Court is familiar with the facts from the extensive pretrial motions practice and from the two-day bench trial held in April of 2010.  Both parties have also submitted proposed findings of

fact.  The Court has reviewed both sets of proposed facts and accepts some of these facts, rejects some, and finds some facts that neither party brought to its attention.  The Court's findings are set forth below.

## I.    PROCEDURAL BACKGROUND.

1.     J. Garcia brings this action against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 to 2680.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1402(b).

3.     J. Garcia alleges that B. Garcia, an off-duty law-enforcement officer with the Isleta Police Department ("IPD"), negligently and recklessly injured him during a wedding reception at the St. Augustine Church catechism building, located in the Pueblo of Isleta, New Mexico, on December 9, 2006.

4.     J. Garcia initially brought four claims against the Defendants: (i) negligent or reckless conduct by B. Garcia; (ii) intentional infliction of emotional distress by B. Garcia; (iii) negligent training and supervision by the Bureau of Indian Affairs ("BIA"); and (iv) assault and battery by B. Garcia.  The United States' liability was based on the principles of respondeat superior and the FTCA.  See Complaint for Damages ¶¶ 21-42, at 6-9, filed March 20, 2008 (Doc. 1).

5.     On March 30, 2009, the Court dismissed all claims against B. Garcia for lack of subject-matter jurisdiction based on J. Garcia's failure to exhaust his tribal remedies against B. Garcia prior to filing this federal action.  See Memorandum Opinion and Order at 8, filed March 30, 2009 (Doc. 24).

6.     On April 5, 2010, the Court granted in part a motion for summary judgment, and thereby dismissed J. Garcia's claim for negligent training and supervision against the United States. See Memorandum Opinion and Order at 28, filed April 5, 2010 (Doc. 60).

-2-

7.      At the time of trial, three claims remained outstanding against the United States: (i) reckless or negligent conduct by B. Garcia; (ii) intentional infliction of emotional distress by B. Garcia; and (iii) assault and battery by B. Garcia.

8.      The Court heard testimony from Monty Gibson, who, among other things, was a training sergeant at the Federal Law Enforcement Training Center ("FLETC"), and has knowledge concerning training on the use of force and defensive tactics.  See Transcript of Trial at 244:24-245:22 (taken April 1, 2010)("Apr. 1 Tr.")(Mitchell, Gibson).[1]

9.      The United States also called several witnesses from the reception that B. Garcia was attending on December 9, 2006.

10.     J. Garcia called himself and several members of his family as witnesses.

11.     Although J. Garcia had three claims outstanding at the time of trial, the evidence and testimony, as well as his proposed findings of fact and conclusions of law, all appeared to be aimed at his negligence claim.

## II.      THE PLAINTIFF.

12.     J. Garcia had some significant health issues before the events giving rise to this case. See Plaintiff's Exhibit 1 (J. Garcia's medical records).

13.     J. Garcia was injured on the job in 2000, after years of working for contractors, mostly on federal jobs.  The injury left him paralyzed on the right side of his body -- including his diaphragm, shoulder, and lung -- and without a right arm.  See Apr. 1 Tr. at 34:18-38:5 (Hall, J. Garcia).

14.     J. Garcia has a prosthetic right arm.  See id. at 50:11-21 (Hall, B. Garcia).

---

[1] The Court's citations to the trial transcripts refer to the court reporter's final draft.

15.     J. Garcia does not wear the prosthetic device at all times because it is too heavy.  <u>See</u> <u>id.</u> at 41:10-42:24 (Hall, J. Garcia); <u>id.</u> at 105:12-21 (Richards, J. Garcia).

16.     J. Garcia's prosthetic arm has only one hand, <u>i.e.,</u> it does not have removable hand-like attachments.  The hand on the prosthetic device is a semi-closed fist.  <u>See</u> Plaintiff's Exhibit 8(h) (picture of John Garcia's prosthetic arm).

17.     J. Garcia cannot lift anything with his prosthetic arm, cannot hold anything with it, and cannot feel anything through it.  <u>See</u> Apr. 1 Tr. at 41:10-42:19 (Hall, J. Garcia).

18.     J. Garcia cannot feel someone touch his prosthetic arm, and would not feel someone grab it and pull on it.  <u>See</u> <u>id.</u> at 41:10-42:19 (Hall, J. Garcia); <u>id.</u> at 44:3-14 (Hall, J. Garcia).

19.     J. Garcia is generally off-balance, with or without the prosthetic arm attached to his body; if someone pulls on his prosthetic arm, he will fall over.  <u>See</u> <u>id.</u> at 106:18-21 (Richards, J. Garcia).

20.     During the trial, when approaching the witness box to testify, J. Garcia tripped and fell, further underscoring his general instability.

21.     After the 2000 work injury, J. Garcia had one year of pain-management training, involving the balancing of various medications.  <u>See</u> <u>id.</u> at 66:3-25 (Hall, J. Garcia).

22.     Since his construction injury resulting in the amputation of his arm in 2000, J. Garcia has daily taken significant pain medication, including methadone, oxycodone, and hydrocodone. <u>See</u> <u>id.</u> at 69:22-24 (Hall, J. Garcia); <u>id.</u> at 29:19-30:15 (Richards, Garcia-Montano).

23.     J. Garcia was diagnosed with Post-traumatic stress disorder ("PTSD") following his construction accident in 2000, and was prescribed Effexor for anxiety related to that injury.  <u>See</u> <u>id.</u> at 72:24-73:9 (Richards, J. Garcia); <u>id.</u> at 9:15 (Richards, J. Garcia).

24.     J. Garcia had GERD[2] before he broke his jaw, and he took Prevacid or Pepcid to alleviate that condition.  See Apr. 1 Tr. at 81:12-15 (Richards, J. Garcia).

25.     J. Garcia also takes medication for diabetes.  See id. at 70:1 (Hall, J. Garcia); id. at 30:25-31:3 (Richards, Garcia-Montano).

## III.     THE ISLETA POLICE DEPARTMENT AND ITS PROCEDURES.

26.     Officers in the IPD perform law enforcement duties pursuant to an Indian Self-Determination and Education Assistance Act ("ISDEAA")[3] contract with the Bureau of Indian Affairs ("BIA") to provide law-enforcement services to Pueblo of Isleta residents. See Plaintiff's Exhibit 10 (638 Contract CTM20T70521 between BIA-Southern Pueblos Agency and Pueblo of Isleta, C-2 Statement of Work).

27.     The ISDEAA contract -- also known as a 638 contract -- was in effect on December 9, 2006.  See Plaintiff's Exhibit 10 (excerpts from the ISDEAA contract for Isleta Law Enforcement).

28.     Employees of the IPD are considered employees of the United States and afforded coverage under the Federal Tort Claims Act only to the extent that they are carrying out the terms or functions of the 638 contract and only while acting within the scope of their employment in

---

[2] GERD stands for "gastroesophageal reflux disease" and refers to a condition where one has chronic heartburn or acid-reflux.

[3] "The ISDEAA[, 25 U.S.C. §§ 450 through 458bbb-2,] was enacted to promote tribal autonomy by permitting tribes to operate programs previously operated by the United States." Walton v. Tesuque Pueblo, 443 F.3d 1274, 1279 (10th Cir. 2006).  See Cherokee Nation of Okla. v. Thompson, 311 F.3d 1054, 1055-56 (10th Cir. 2002)("Under the [ISDEAA] the Secretary of Health and Human Services . . . may enter into contracts or compacts with Indian tribes (self-determination contracts) to permit the tribes to administer various programs that the Secretary would otherwise administer."), rev'd on other grounds, 543 U.S. 631 (2005).  For instance, through an ISDEAA contract, an Indian tribe could establish a police force for their tribe.  In this case, the ISDEAA contract allowed the Pueblo of Isleta to establish a police force.

carrying out the contract.  See Pub. L. 101-512, Section 314, 104 Stat. 1915, 1960.  See also Big

Crow v. Rattling Leaf, 296 F. Supp. 2d 1067, 1068-69 (D.S.D. 2004)("Where a self-determination

(638) contract exists, the United States may be liable for the negligent acts of tribal employees when

the employee in question is acting within the employee's scope of employment.")

29.     The ISDEAA contract provides several general objectives that Pueblo of Isleta Law

Enforcement should endeavor to attain.  Among these objectives is "[m]aintain[ing] security for all

residents within the Isleta Indian Reservation through crime prevention and law enforcement

activities," and  to "[r]espond to any and all verbal or written complaint[s] registered by residents

of the Isleta Indian Reservation and to document these allegations."  Plaintiff's Exhibit 10 at 20-21.

30.     The Standard Operating Procedures ("SOPs") for the IPD provide that personnel shall

not commit acts that constitute a violation of any of the department's rules, regulations, directives,

or orders.  See Apr. 1 Tr. at 197:5-9 (Richards, Alvarez); Defendant's Exhibit A (IPD's SOPs).

31.     The SOPs provide that it is the responsibility of an off-duty police officer to

immediately report suspected or observed criminal activities to on-duty officers.  See Apr. 1 Tr. at

197:16-22 (Richards, Alvarez); SOPs § 2-03-3(A) ("While off-duty, it is the responsibility of the

police officer to immediately report any suspected or observed criminal activities to on-duty

authorities.").

32.     The SOPs also provide that Isleta police officers should not engage in situations in

which they are personally involved.  See Apr. 1 Tr. at 198:11-13 (Richards, Alvarez); SOPs § 2-03

(defining "PERSONALLY INVOLVED"); id. § 2-03-4(A) (prohibiting a police officer from making

an arrest "[w]hen the arresting officer is personally involved in the incident underlying the arrest.").

33.     The IPD interprets the SOPs as giving off-duty officers discretion to enforce minor

violations such as harassment, disorderly conduct, or other quality-of-life offenses.  See Apr. 1 Tr.

at 276:5-19 (Vollmann, Gibson); id. at 199:20-200:3 (Hall, Alvarez).

34.     Off-duty officers have responsibilities, see id. at 240:25-241:2 (Hall, B. Garcia),
including keeping the peace, see id. at 241:3-11 (Hall, B. Garcia).

35.     The term "force" in the law-enforcement context is a term of art which is primarily
used in the context of getting a subject or suspect under control.  See id. at 248:22-25 (Mitchell,
Gibson).

36.     The decision to use force in law enforcement is based upon the officer's perception
of three things, which is based on the subject's actions: (i) whether the subject has the opportunity
to hurt the officer or another person; (ii) whether the subject has the intent to hurt the officer or
another person; (iii) whether the subject has ability to hurt the officer or another person.  See id. at
249:2-11 (Mitchell, Gibson).

37.     A police officer giving a lawful order is exercising his authority as a police officer,
and once a lawful order is given, the subject has an opportunity to comply with the order.  See id.
at 249:12-20 (Mitchell, Gibson).

38.     Based on the reaction to the lawful order, the police officer develops a response by
using force or whatever is needed to control the subject.  See Apr. 1 Tr. at 249:21-24 (Mitchell,
Gibson).

39.     Police officers are trained to identify themselves, give the subject a lawful order, and
give the subject the opportunity to comply with that order.  See id. at 249:25-250:12 (Mitchell,
Gibson).

40.     Force is deemed excessive when the force used by the police officer is not reasonable
under the totality of the circumstances.  See id. at 250:19-25 (Mitchell, Gibson).

41.     A law-enforcement officer uses "defensive tactics" when that officer exercises his

or her authority as a police officer and is put into a position to defend himself or herself.  Id. at

252:20-24 (Mitchell, Gibson).

42.     What defensive tactic a police officer should use depends on the officer's perception

of the situation, because an officer responds based on what he or she perceives will stop an adverse

action and gain control of the subject.  See id. at 253:3-9 (Mitchell, Gibson).

43.     Any civilian has a right to defend himself or herself.  See id. at 252:24-25 (Mitchell,

Gibson).

44.     At FLETC, law-enforcement officers are taught the steps that must be taken after a

law-enforcement encounter happens.  See Apr. 1 Tr. at 253:10-13 (Mitchell, Gibson).

45.     The law-enforcement profession's standard policy and procedures require that, if an

officer is involved in an incident where he or she needs to use force, the officer must write a use-of-

force report after the incident.  See id. at 253:18-20 (Mitchell, Gibson).

46.     If an officer has to use force in the scope of his or her authority as a police officer,

the officer is likely going to arrest someone, because that is why an officer uses force.  See id. at

253:23-25 (Mitchell, Gibson).

47.     A police officer's understanding that other people expect him to control a situation

does not dictate the police officer's action or require the officer to intervene in the situation.  See

id. at 290:18-24 (Mitchell, Gibson).

## IV.    TWO WEDDINGS AND A BROKEN JAW.

48.     On December 9, 2006, the IPD employed B. Garcia as a police officer.  See Apr. 1

Tr. at 220:15-20 (Mitchell, B. Garcia).

49.     B. Garcia received his police training at FLETC.  See id. at 220:21-221:8 (Mitchell,

B. Garcia).

### A.     THE WEDDING RECEPTION IN THE CATECHISM BUILDING.

50.     On December 9, 2006, around 1:00 p.m., B. Garcia -- accompanied by his girlfriend, her children, and his son -- was attending his brother's wedding reception in the St. Augustine Church catechism building, an auxiliary building at the St. Augustine Church.  See Apr. 1 Tr. at 221:13-21 (Mitchell, B. Garcia).

51.     B. Garcia was spending time with his family, having a meal and hanging around.  See id. at 221:24-222:1 (Mitchell, B. Garcia).

52.     B. Garcia was not in uniform.  He was wearing blue jeans and a polo shirt, and did not have his badge or service revolver with him.  See id. at 221:22-23 (Mitchell, B. Garcia); id. at 222:2-5 (Mitchell, B. Garcia).

53.     B. Garcia was off duty when attending his brother's wedding reception, and did not go on duty with IPD until 2:52 p.m. that day, at which time he assumed his full employment responsibilities.  See id. at 174:1-9 (Richards, Abieta).

### B.     THE WEDDING IN THE MAIN CHURCH-BUILDING.

54.     Also on December 9, 2006, at around 1:00 p.m., J. Garcia was attending his daughter's wedding at St. Augustine Church, in the main church-building.  See Apr. 1 Tr. at 12:4-9 (Hall, Garcia-Montano); id. at 13:1-15 (Hall, Garcia-Montano).

55.     The Montano family, into which J. Garcia's daughter was marrying, had been members of the St. Augustine Parish for many years, and J. Garcia's daughters had been to that church numerous times over a period of several years.  See id. at 13:12-14:15 (Hall, Garcia-Montano); Plaintiff's Exhibit 8(b) (photograph of crowd outside the church).

56.     J. Garcia was wearing a tuxedo jacket over his prosethetic arm that day because he was minutes away from walking his daughter down the aisle at her wedding in the main church

building.  See Apr. 1 Tr. at 42:25-43:4 (Hall, J. Garcia).

57.     At 1:00 p.m., J. Garcia was in the limousine outside the main entrance, waiting for the signal to start the procession.  See id. at 16:13-17:2 (Hall, Garcia-Montano).

58.     J. Garcia's four-year-old granddaughter, Ashley, was the flower girl.  While sitting with J. Garcia and the bride's party in the limousine in front of the church, Ashley stated that she had to use the restroom.  See id. at 16:3-17:9 (Hall, Garcia-Montano).

59.     The restroom inside the main building of the St. Augustine Church was not working, so the priest instructed the attendants of the wedding for J. Garcia's daughter to use the restroom in the catechism building.  See id. at 14:16-24 (Hall, Garcia-Montano).

60.     Before the wedding started, J. Garcia took Ashley to the restroom in the catechism building.  See id. at 17:3-12 (Hall, Garcia-Montano).

61.     A bridesmaid also decided to go to the restroom.  See id. at 29:5-9 (Richards, Garcia-Montano).

62.     J. Garcia accompanied his granddaughter and the bridesmaid to the catechism building so that his granddaughter could use the restroom.  See id. at 17:3-18:16 (Hall, Garcia-Montano); id. at 47:9-22 (Hall, J. Garcia).

63.     Upon reaching the catechism building, Ashley and the bridesmaid went into the restroom while J. Garcia waited in an empty room near the entry foyer of the catechism building.  See id. at 92:24-93:9 (Richards, J. Garcia); Defendant's Exhibit D-12 (photograph of the entry area/foyer).

64.     Neither the priest nor anyone else at the St. Augustine Church told members of the wedding reception in the catechism building that the bathroom in the church was broken and that there was a possibility that people would be coming in to use the restrooms in the catechism

building.  See Apr. 1 Tr. at 158:6-13 (Mitchell, Lente-Jojola); Transcript of Trial at 5:24-6:2 (taken

April 7, 2010)("Apr. 7 Tr.")(Mitchell, Jojola).

### C.     CACOPHONY IN THE CATECHISM BUILDING.

65.     Around 1:00 p.m. on December 9, 2006, there were thirty to forty people attending

the wedding reception in the catechism building.  See Apr. 1 Tr. at 158:1-5 (Mitchell, Lente-Jojola).

66.     On two occasions, people from the wedding taking place in the main building of the

St. Augustine Church came to use the bathroom in the catechism building.  See id. at 160:24-161:9

(Mitchell, Lente-Jojola).

67.     The people attending the wedding reception thought that the people who were coming

over from the church to use the bathroom were extremely disruptive and rude.  See id. at 161:10-23

(Mitchell, Lente-Jojola).

68.     B. Garcia has known Kateri Jojola, a young lady attending the wedding reception in

the catechism building, for a long time.  See Apr. 7 Tr. at 4-6 (Mitchell, Jojola).  B. Garcia has taken

care of her as family.  See id.

69.     Jojola put up signs stating that people should not come into the reception hall to use

the restroom.  See id. at 7:11-13 (Mitchell, Jojola).

70.     Unbeknownst to J. Garcia, some of the women at B. Garcia's brother's wedding

reception in the catechism building had taken offense that some wedding participants at the Garcia-

Montano wedding used the restroom in the catechism building.  See Apr. 1 Tr. at 230:7-231:2 (Hall,

B. Garcia).

71.     J. Garcia stood in the catechism building, by the buffet table where the food for the

wedding reception was located.  See id. at 47:9-22 (Hall, J. Garcia); id. at 89:2-9 (Richards, J,

Garcia).

72.     The people attending the wedding reception saw J. Garcia enter the reception area. They perceived him to be a large, older man in a tuxedo and "Mad Dog" sunglasses, who was boisterous, loud, rude, obnoxious, and arrogant.  See id. at 162:5-12 (Mitchell, Lente-Jojola); Apr. 7 Tr. at 7:14-8:9 (Mitchell, Jojola); id. at 16:23-17:21 (Mitchell, Zuni).

73.     Three of the women attending the reception in the catechism building -- who objected to the people from the Garcia-Montano wedding using the bathroom in that building -- came into the small, empty waiting room and verbally accosted J. Garcia.  See Apr. 1 Tr. at 92:1-93:2 (Richards, J. Garcia); id. at 99:1-13 (Richards, J. Garcia); id. at 231:17-21 (Hall, B. Garcia)(stating that there were three or four women arguing with J. Garcia).  But see Apr. 7 Tr. at 9:7-11 (Mitchell, Jojola)(stating that only she and Debra Lente-Jojola were standing with J. Garcia).  The Court partially credits B. Garcia's testimony on this point.  It appears to the Court that there were more than two women involved, but not four.

74.     The women in the family into which B. Garcia's brother married are loud-mouthed, talk too much, and were "all over" J. Garcia when he was in the waiting area.  Apr. 1 Tr. at 229:13-232:2 (Hall, B. Garcia); Plaintiff's Exhibit 11 at 29-30 (June 15, 2007 interview of B. Garcia).

75.     Jojola, who was about eighteen years old at that time, approached and began speaking to J. Garcia.  See Apr. 1 Tr. at 162:13-19 (Mitchell, Lente-Jojola); Apr. 7 Tr. at 7:22-8:9 (Mitchell, Jojola).

76.     Jojola asked J. Garcia to leave the area several times.  See Apr. 1 Tr. at 92:12-16 (Richards, J. Garcia); Apr. 7 Tr. at 8:8 (Mitchell, Jojola).

77.     Debra Lente-Jojola, Jojola's aunt, told J. Garcia that they were having a wedding reception, and that his behavior was rude and inappropriate.  See Apr. 1 Tr. at 163:9-12 (Mitchell, Lente-Jojola).

-12-

78.     J. Garcia tried to tell the women that he was in an extremely happy mood and loved everybody, but they did not hear him.  See id. at 46:19-22 (Hall, J. Garcia); id. at 94:3-95:2 (Richards, J. Garcia).

79.     Jojola heard J. Garcia say "I love you," saw him lean in closer to her, and felt him touch her on her bare right shoulder.  See id. at 162:15-25 (Mitchell, Lente-Jojola); id. at 94:3-96:16 (Richards, Garcia); Apr. 7 Tr. at 8:10-9:2 (Mitchell, Jojola).

80.     On December 9, 2006, J. Garcia's prosthetic arm was locked in place with its elbow bent at a forty-five-degree angle.  See Apr. 1 Tr. at 50:11-21 (Hall, B. Garcia).

81.     J. Garcia's prosthetic arm inadvertently brushed against Jojola's shoulder.  See id. at 49:15:50-2 (Hall, J. Garcia).

82.     Jojola thought J. Garcia's behavior was weird, as he was an older man touching a young girl; she felt very uncomfortable and repeatedly asked him to leave.  See Apr. 7 Tr. at 8:24-9:4 (Mitchell, Jojola).

83.     Jojola was upset and started talking louder and more forcefully, saying, among other things, "don't touch me."  Apr. 1 Tr. at 162:20-21 (Mitchell, Lente-Jojola); id. at 95:5 (Richards, J. Garcia); Apr. 7 Tr. at 9:15-18 (Mitchell, Jojola); id. at 18:14-19 (Mitchell, Zuni); id. at 223:19-24 (Mitchell, B. Garcia).

**D.     B. GARCIA, THE POLICE OFFICER, STEPS IN TO KEEP THE PEACE.**

84.     B. Garcia heard Jojola raise her voice and tell J. Garcia: "Don't touch me."  Apr. 1 Tr. at 223:2-12 (Mitchell, B. Garcia).

85.     J. Garcia was talking loudly.  See id. at 163:23-24 (Mitchell, Lente-Jojola); Apr. 7 Tr. at 17:19-21 (Mitchell, Zuni).

86.     From the nearby reception area, B. Garcia observed a large gentleman with a beard

arguing with his family members.  See Apr. 1 Tr. at 222:15-21 (Mitchell, B. Garcia).

      87.     B. Garcia thought the large gentleman's behavior was "rude and obnoxious," and out of control "verbally."  Id. at 223:8-18 (Mitchell, B. Garcia).

      88.     B. Garcia could see that a disturbance was brewing because three or four women he thought had big mouths were "at him," and J. Garcia was being loud back.  Id. at 231:13-25 (Hall, B. Garcia).

      89.     B. Garcia became involved in the disturbance because "people started to look at [him] and knew that [he] was a police officer, and just the looks that [he] was getting, it was like: 'Oh, aren't you going to do something or what?'"  Id. at 227:1-7 (Mitchell, B. Garcia); id. at 229:13-230:1 (Hall, B. Garcia); id. at 242:3-10 (Mitchell, B. Garcia).

      90.     B. Garcia and two other men then approached J. Garcia and Jojola.  See id. at 98:11-17 (Richards, J. Garcia); id. at 100:5-17 (Richards, J. Garcia).

      91.     B. Garcia came over to assist Lente-Jojola and Jojola, because he was the groom's brother and because he was under pressure from family and other guests at the reception to do something, in part because he was a police officer.  See id. at 166:12-16 (Mitchell, Lente-Jojola); id. at 242:3-10 (Mitchell, B. Garcia).

      92.     When B. Garcia first approached J. Garcia and the women confronting him, B. Garcia was acting as a peace-keeper because he felt pressure from the other guests to step in and take charge of the situation.  At that time, although his actions were consistent with those of a police officer, and he was pressured to do something, in part because he was a police officer, they were also motivated in part because he was a concerned guest who observed a close family member arguing with a stranger in the midst of a celebratory gathering.  At that time, he was not acting in his capacity as a police officer.  See id. at 225:23-25 (Mitchell, B. Garcia); id. at 228:19-23

-14-

(Mitchell, B. Garcia).[4]

93.     B. Garcia asked Jojola if she was okay.  See Apr. 7 Tr. at 10:3-4 (Mitchell, Jojola).

94.     Jojola did not think that B. Garcia approached her because he was a police officer, but thought that B. Garcia came over to her when she was talking forcefully to J. Garcia because B. Garcia was concerned about her.  See id. at 12:2-6 (Mitchell, Jojola).

95.     When B. Garcia reached Lente-Jojola, Jojola, and J. Garcia, he quietly instructed J. Garcia to leave; J. Garcia did not immediately comply.  See Apr. 1 Tr. at 98:11-19 (Richards, J. Garcia); id. at 100:18-21 (Richards, J. Garcia).

96.     B. Garcia asked J. Garcia to leave, told him he was being disrespectful, and told him that J. Garcia likely would not appreciate it if somebody came to his party and did the same thing to him.  See id. at 224:6-12 (Mitchell, B. Garcia).

97.     Pursuant to the provisions of the SOPs, as an off-duty police officer, B. Garcia should not have become involved in the disruption at the wedding reception involving J. Garcia and B. Garcia's family and friends.  See id. at 198:14-18 (Richards, Alvarez).

98.     J. Garcia did not think that the situation was one in which a police officer was needed.  See id. at 119:13-15 (Mitchell, J. Garcia).

99.     J. Garcia tried to tell the women -- and B. Garcia, when he appeared -- that he was waiting for his granddaughter to come out of the restroom.  See id. at 233:18-23 (Hall, B. Garcia).

100.    J. Garcia did not have an opportunity to explain why he was in the catechism

---

[4] The Court credits B. Garcia's testimony to the extent that he stated he initially approached the disturbance as an authoritative family member and not as a police officer.  The Court does not credit it fully, however, because the Court concludes that B. Garcia's intent eventually shifted as he concluded that the best way to deal with the situation was as a police officer, rather than as a family member.

building, because the women were "on him," and B. Garcia had to do something to quell the disturbance.  Id. at 233:4-23 (Hall, B. Garcia).

     101.    J. Garcia became more belligerent after B. Garcia asked him to leave, and he refused to leave.  See id. at 10:5-11 (Mitchell, Jojola); id. at 19:4-13 (Mitchell, Zuni).

     102.    A disturbance existed, and, as a result, B. Garcia began escorting J. Garcia toward the door of the catechism building to end the disturbance.  See id. at 224:9-22 (Mitchell, B. Garcia); id. at 235:23-236:1 (Mitchell, B. Garcia).

     103.    B. Garcia did not touch J. Garcia as they were walking out of the catechism building.  See id. at 48:14-15 (Richards, B. Garcia); id. at 235:23-236:1 (Mitchell, B. Garcia).

     104.    Once at the doorway, J. Garcia turned around, and pushed B. Garcia.  See id. at 225:3-15 (Mitchell, B. Garcia); Apr. 7 Tr. at 10:12-23 (Mitchell, Jojola); id. at 19:6-21 (Mitchell, Zuni).

     105.    B. Garcia then pushed back and placed his hands on J. Garcia's chest.  See Apr. 1 Tr. at 225:3-15 (Mitchell, B. Garcia); Apr. 7 Tr. at 10:12-23 (Mitchell, Jojola); id. at 19:6-21 (Mitchell, Zuni).

     106.    After J. Garcia and B. Garcia pushed each other, B. Garcia identified himself as an police officer, hoping to convince J. Garcia to stop fighting and leave the catechism building peacefully.  See Apr. 1 Tr. at 225:16-22 (Mitchell, B. Garcia).[5]

---

    [5] J. Garcia testified that B. Garcia identified himself as an police officer while escorting him out of the building.  See Apr. 1 Tr. at 48:3-10 (Hall, J. Garcia); id. at 54:15-18 (Hall, J. Garcia); id. at 101:11-17 (Richards, J. Garcia).  This testimony implies that the identification occurred before the brief shoving-match.  Given J. Garcia's memory problems, see, e.g., id. at 101:18-102:9 (Richards, J. Garcia), and B. Garcia's testimony, see id. at 225:3-22 (Mitchell, B. Garcia), the Court believes J. Garcia's testimony is imprecise on this timing issue, and that B. Garcia identified himself as an officer after the two initially pushed each other.  There is also a dispute whether B. Garcia identified himself as a police officer or as an off-duty police officer.  B. Garcia testified that he used

-16-

107.    When B. Garcia identified himself as a police officer, he began to be actuated by a

intent to be a police officer, rather than only by the pressure of the family and friends at the wedding

reception.  He believed it was necessary to act as a police officer to quell an escalating situation.

At the time B. Garcia identified himself as a police officer -- which was after J. Garcia initiated a

physical confrontation -- there was sufficient objective indication of B. Garcia's intent for the Court

to conclude that he intended, at that time, to act as a police officer.[6]

108.    B. Garcia told J. Garcia that he was a police officer because he was attempting to

_____

the phrase "off-duty," see Apr. 1 Tr. at 225:16-18 (Mitchell, B. Garcia), but J. Garcia insists that B. Garcia did not use that phrase, see id. at 101:3-17 (Richards, J. Garcia).  While the Court might otherwise be inclined to credit B. Garcia's testimony, his testimony was inconsistent with his written statement, in which he wrote only that he "advised [J. Garcia] [that he] was a police officer." Plaintiff's Exhibit 20.  The Court finds it more believable that, in the midst of a brewing physical altercation, B. Garcia would state "I'm a police officer," and would not think to clarify his on-duty/off-duty status.  The Court thus concludes that B. Garcia did not refer to himself as an "off-duty" police officer, but rather told J. Garcia only that he was a police officer.

    [6] Before this point, as the Court explains in more depth in the Conclusions of Law, the Court concludes that B. Garcia was not acting within the scope of his employment.  In New Mexico, an employee is within the course and scope of employment when his or her action "(1) is the kind the employee is employed to perform; (2) occurs during a period reasonably connected to the authorized employment period; (3) occurs in an area reasonably close to the authorized area, and (4) is actuated, at least in part, by a purpose to serve the employer."  Narney v. Daniels, 115 N.M. 41, 49, 846 P.2d 347, 355 (1992).  Both before and after his announcement, B. Garcia was trying to avert a disturbance of the peace, and thus was performing the kind of action he is employed as a police officer to perform.  His actions occurred less than two hours from his scheduled shift and in a place where he has jurisdiction as an IPD officer, thus meeting the second and third elements of the course-of-employment test.    Until he identified himself as a police officer, however, the preponderance of the evidence indicated that B. Garcia was acting only because he was a concerned guest of the reception and because the other guests were looking to him, for whatever reason, to intervene.  Once, however, he identified himself as a police officer -- combined with his taking control of the situation, attempting to avert a disturbance that might have escalated, giving J. Garcia an order to leave, and escorting J. Garcia from the catechism building -- the Court finds the preponderance of the evidence tips in favor of finding that B. Garcia's conduct was "actuated, at least in part, by a purpose to serve [his] employer."  Narney v. Daniels, 115 N.M. 41, 49, 846 P.2d 347, 355 (1992).  That B. Garcia then executed a defensive tactic that he learned at FLETC further bolsters this conclusion.

quell a brewing fight between two individuals in a public place.  See id. at 225:16-25 (Mitchell, B. Garcia).

109.    Once B. Garcia identified himself as a police officer, he had some additional responsibilities as an officer.  See id. at 271:4-15 (Vollmann, Gibson).

110.    B. Garcia was not trying to arrest J. Garcia, as the SOPs prohibit such conduct, but rather was trying to quell the disturbance by ordering J. Garcia to leave and escorting him out of the building through the doorway.  See id. at 235:23-236:1 (Hall, B. Garcia); Plaintiff's Exhibit 11, at 27 (stating that B. Garcia did not immediately contact superiors or arrest J. Garcia, choosing to let everyone go back to their respective weddings).

111.    After B. Garcia told J. Garcia that he was a police officer, J. Garcia again advanced toward B. Garcia and said: "I don't give a fuck."  Apr. 1 Tr. at 226:3-4 (Mitchell, B. Garcia).

112.    While in the doorway, J. Garcia turned to look over his shoulder at his daughter's wedding party.  See id. at 48:25-49:2 (Hall, J. Garcia); id. at 54:3-5 (Hall, J. Garcia).

113.    When J. Garcia turned to look over his shoulder, his prosthetic arm elevated, and B. Garcia thought that J. Garcia was going to "give him a hook or something."  Id. at 54:6-11 (Hall, J. Garcia).  See id. at 107:16-23 (Richards, J. Garcia); id. at 242:11-19 (Mitchell, B. Garcia).

114.    A reasonable person who did not know that J. Garcia had a prosthetic arm could perceive J. Garcia's movement as threatening.  See id. at 108:5-8 (Richards, J. Garcia).

115.    B. Garcia reasonably perceived J. Garcia's elevated prosthetic arm as threatening to hurt him.

116.    B. Garcia thought J. Garcia was coming at him again, and so B. Garcia deflected J. Garcia's arms and pushed him to the right, pulling on the prosthetic limb in the process.  See Apr. 1 Tr. at 226:6-22 (Mitchell, B. Garcia).

-18-

117.    B. Garcia perceived J. Garcia's arm coming towards him and, based on his training, used a defensive tactic to defend himself, deflecting the aggression to the right and down, which resulted in J. Garcia falling to B. Garcia's right and to the ground.  See id. at 216:18-24 (Hall, Alvarez); id. at 226:3-22 (Mitchell, B. Garcia).

118.    B. Garcia's actions were largely consistent with his federal law-enforcement training. He told J. Garcia to leave, attempted to escort J. Garcia out the doorway, and eventually identified himself as a police officer.  When B. Garcia perceived J. Garcia as making a threatening motion toward him, he evaluated J. Garcia's arm movements and executed a defensive tactic.  See id. at 255:1-15 (Mitchell, Gibson).

119.    The technique that B. Garcia used was consistent with his federal law-enforcement training.  See id. at 216:18-24 (Hall, Alvarez); id. at 241:12-19 (Hall, B. Garcia).

120.    B. Garcia's response to his reasonable belief that J. Garcia was attempting to harm him -- i.e., the technique he used to deflect the perceived hook or push coming from J. Garcia and acting as a law-enforcement officer at the time -- was appropriate under the circumstances.  See id. at 254:8-255:6 (Mitchell, Gibson).

121.    B. Garcia uses this technique to deflect a blow whether he is acting as a police officer or as a civilian.  See id. at 243:3-12 (Hall, B. Garcia).

122.    B. Garcia did nothing but deflect what he reasonably perceived to be J. Garcia's aggressive action.  See id. at 235:1-3 (Hall, B. Garcia); id. at 229:4-5 (Mitchell, B. Garcia).

123.    B. Garcia reasonably believed his actions were done in self-defense.  See id. at 226:18-22 (Mitchell, B. Garcia).

124.    B. Garcia did not intend to batter J. Garcia and did not hit him in the jaw.  B. Garcia unintentionally pulled J. Garcia down by grabbing his prosthetic arm, which caused J. Garcia to hit

-19-

a wooden pole in the building.  See id. at 238:22-239:8 (Hall, B. Garcia); Defendant's Exhibits D-19, D-20, & D-21 (photographs of the catechism building's entrance and a large wooden pillar immediately outside).

125.    No one struck J. Garcia.  See Apr. 1 Tr. at 48:21-22 (Hall, J. Garcia)(stating that he did not see anybody strike him); id. at 52:14-54:2 (Hall, J. Garcia)(stating that he did not know what struck him, did not see anyone hit him, and did not feel anyone push him or hit him); id. at 235:4-22 (Hall, B. Garcia).

126.    J. Garcia never felt a blow to the head, nor was he kicked.  See id. at 110:12-111:9 (Richards, J. Garcia).

127.    J. Garcia does not know what happened or how he was injured.  See id. at 52:20-24 (Hall, J. Garcia); id. at 108:14-25 (Richards, J. Garcia).

128.    J. Garcia fell to the ground on his knees.  See id. at 54:1-3 (Hall, J. Garcia).

129.    Although J. Garcia cannot feel when one touches his prosthetic arm, B. Garcia pulled on it and that caused J. Garcia to fall over.  See id. at 42:20-24 (Hall, J. Garcia); id. at 44:3-10 (Hall, J. Garcia); id. at 48:15-22 (Hall, J. Garcia); id. at 120:16-121:21 (Hall, J. Garcia).

130.    B. Garcia, as a police officer, "had an obligation to follow through with the welfare of [J. Garcia] and pursue the appropriate police actions."  Id. at 272:4-19 (Vollmann, Gibson); Gibson's Expert Report at 1.

131.    Although B. Garcia did not follow through with the requirements of the IPD, he was in the scope of his employment as a police officer.  His statement that he was a police officer, along with the other circumstances -- e.g., that he felt pressure to act because others knew he was a police officer and that he then acted in conformity with his federal training -- placed him in the scope of

-20-

employment.  Apr. 1 Tr. at 272:4-273:7 (Vollmann, Gibson).[7]  See Gibson's Expert Report at 1.

132.    Based on his training and experience as a law-enforcement officer, B. Garcia was intending to act in the scope of his authority as a police officer when he identified himself as a police officer to take advantage of the additional authority to which that position entitled him.

133.    In accordance with his training and experience as a law-enforcement officer, B. Garcia's identified himself as a police officer during this incident to gain the attention of the subject and to diffuse the situation.

134.    B. Garcia identified himself as a police officer to J. Garcia after instructing J. Garcia to leave the area, intending to clothe that instruction in his official police authority.

135.    B. Garcia did not intend to arrest J. Garcia or take him into custody.  See Apr. 1 Tr. at 227:10-15 (Mitchell, B. Garcia).

136.    B. Garcia did not prepare an incident report after the altercation at the wedding reception.  See id. 243:1-2 (Hall, B. Garcia).

137.    B. Garcia did not intend to call for an on-duty police officer to handle the situation. See id. at 227:16-18 (Mitchell, B. Garcia).

138.    There was not any visible blood on John Garcia after he fell; he did not touch his jaw; and he continued to talk as he left the area.  See Apr. 7 Tr. at 10:20-11:21 (Mitchell, Jojola).

139.    After J. Garcia left the reception area, B. Garcia went back to the catechism hall to enjoy the reception, reasonably believing that J. Garcia was not injured.  See Apr. 1 Tr. at 227:19-23

_____

[7] The Court rejects the implicit opinion of Gibson that it is unlikely that B. Garcia was acting within the scope of employment because he did not act consistently with police protocols.  Such a standard would essentially absolve a law-enforcement employer from liability, because whenever its officers did something wrong, the employer would argue that the employee was not within the course and scope of his employment.

(Mitchell, B. Garcia); Plaintiff's Exhibit 11 at 27 (B. Garcia)(explaining that he did not contact his superiors after the incident because he did not know that J. Garcia was injured).

140.    The incident at the wedding reception was a scuffle between two individuals -- a shoving match -- and J. Garcia fell and was injured.  See Apr. 1 Tr. at 291:9-12 (Mitchell, Gibson).

### E.    B. GARCIA REPORTS THE INCIDENT TO HIS SUPERIORS, PROMPTING AN INVESTIGATION.

141.    B. Garcia reported for duty at the IPD later in the afternoon of December 9, 2006. See Apr. 1 Tr. at 227:24-228:1 (Mitchell, B. Garcia).

142.    At 2:52 p.m., when he went to work, B. Garcia told his supervisor at IPD, Sergeant. Albert Abeita, what happened at the reception.  See id. at 228:2-7 (Mitchell, B. Garcia).

143.    B. Garcia did not tell Abeita that he had been acting as a police officer or acting in furtherance of his duties at the police department during the incident at the reception.  See id. at 228:8-10 (Mitchell, B. Garcia); id. at 175:8-11 (Richards, Abeita); id. at 193:6-8 (Richards, Abeita).

144.    Abeita asked B. Garcia to write a statement about the off-duty incident at the wedding reception to give information to Abeita and for B. Garcia's own protection.  See id. at 181:18-24 (Hall, Abeita).

145.    B. Garcia submitted a written statement that J. Garcia swung his arm at B. Garcia's face and B. Garcia leaned back to avoid being hit and grabbed J. Garcia's forearm, pulled J. Garcia toward and then away from B. Garcia, causing J. Garcia to fall to B. Garcia's right side.  See Plaintiff's Exhibit 20 (B. Garcia's written statement).

146.    B. Garcia's written statement represented:

The male subject swung his arm at my face so I leaned back to avoid being hit.  With his forearm swinging behind me, I grabbed it and pulled his force towards me and away, causing him to fall to the right side of me into an upright pole of the building.

Apr. 1 Tr. at 238:22-239:3.  <u>See</u> Plaintiff's Exhibit 20 (B. Garcia's statement); Plaintiff's Exhibit 11 (June 15, 2007 interview of B. Garcia).

147.   Abeita decided that B. Garcia was not acting in furtherance of IPD business because he was not part of law enforcement, and had no law-enforcement responsibility, while he was attending his brother's wedding reception as a civilian.  <u>See</u> Apr. 1 Tr. at 175:15-176:2 (Richards, Abeita).

148.   BIA and the IPD Internal Affairs Units interviewed B. Garcia, critiqued his conduct, concluded there was no assault or battery by B. Garcia, and did not fire him for escorting J. Garcia out of the catechism building while off-duty.  <u>See</u> Plaintiff's Exhibits 9 (letter from Monty Gibson to George Jojola, Chief of Police (dated May 5, 2008), and attached BIA Internal Affairs report); Plaintiff's Exhibit 11 (June 15, 2007 interview with B. Garcia); Plaintiff's Exhibit 12 (letter from George Jojola to Vernon Alvarez (dated June 1, 2007)).

149.   BIA Internal Affairs conducted an investigation in 2008 concerning allegations that B. Garcia had assaulted J. Garcia.  <u>See</u> Apr. 1 Tr. at 256:14-25 (Mitchell, Gibson).

150.   BIA Internal Affairs determines whether there is merit to an allegation of misconduct. <u>See</u> <u>id.</u> at 257:22-24 (Mitchell, Gibson).

151.   The questions asked by the BIA Internal Affairs officers are not evidence; the findings in an Internal Affairs investigation are based on the answers that the investigating officers elicited.  <u>See</u> <u>id.</u> at 292:1-6 (Mitchell, Gibson).

152.   BIA Internal Affairs concluded that the evidence submitted to it showed that B. Garcia was off-duty and his actions were off-duty misconduct, if anything.  <u>See</u> <u>id.</u> at 258:17-19 (Mitchell, Gibson).

153.   The BIA Internal Affairs investigation determined that the evidence showed that,

while B. Garcia identified himself as a police officer, he did that in an attempt to deter J. Garcia from assaulting him a second time.  See id. at 10:15 (Mitchell, Gibson).

154.    The BIA Internal Affairs investigation determined that there was insufficient evidence to support the allegations of assault by B. Garcia on J. Garcia, and the allegation of conduct unbecoming an officer was not sustained.  See Apr. 1 Tr. at 257:16-19 (Mitchell, Gibson); id. at 260:13-18 (Mitchell, Gibson).

155.    BIA Internal Affairs investigators agreed that, once B. Garcia identified himself as an officer and decided to act, he had additional work-related responsibilities.  See Plaintiff's Exhibit 11 at 12-13 (transcript of July 15, 2007 interview with B. Garcia).

## V.    ALTHOUGH NO ONE IMMEDIATELY REALIZED IT, J. GARCIA WAS SUBSTANTIALLY INJURED IN THE ENCOUNTER.

156.    After B. Garcia escorted him out the doorway area, J. Garcia found himself on all fours, looking at the dirt, and tasting blood.  See Apr. 1 Tr. at 48:11-49:10 (Hall, J. Garcia); id. at 120:6-25 (Hall, J. Garcia).

157.    Although he does not know how it happened, J. Garcia had a broken jaw after his encounter with B. Garcia.  See Apr. 1 Tr. at 48:11-49:10 (Hall, J. Garcia); id. at 52:20-24 (Hall, J. Garcia); id. at 108:14-25 (Richards, J. Garcia).

158.    When J. Garcia returned to the church where the guests and the groom were waiting for his daughter to come down the aisle, the priest and J. Garcia decided to proceed; the bride, Shannon Garcia-Montano, wanted J. Garcia to go straight to the hospital.  See Apr. 1 Tr. at 55:6-22 (Hall, J. Garcia).

159.    J. Garcia "soldiered up" to overcome the bleeding and pain so that his daughter's wedding could proceed.  See id. at 15:22 (Hall, J. Garcia).

160.     By the time the wedding ceremony ended and J. Garcia returned to the limousine with the wedding party, he was in extreme pain.  See id. at 56:8-22 (Hall, J. Garcia); Plaintiff's Exhibit 8(a) (photograph of J. Garcia, in front of the bride and groom, grimacing with eyes closed).

161.     The limousine went to the Hotel Albuquerque in Old Town, where J. Garcia hid his injury, while meeting with old friends, by spitting blood into a cup he carried in his pocket.  See Apr. 1 Tr. at 56:23-57:14 (Hall, J. Garcia).

162.     The pain drove J. Garcia to return to his hotel room; once there, he laid down and a friend made sure that he did not choke on the blood.  See id. at 59:2-15 (Hall, J. Garcia).

163.     J. Garcia was aware that his teeth were knocked out of his gums and almost falling out of his mouth.  See id. at 59:2-15 (Hall, J. Garcia).

164.     J. Garcia remained in the hotel room to keep his promise to his daughter that he would perform the father-daughter dance.  When the time came for the dance, he went to the reception area, still in extreme pain.  See id. at 59:2-15 (Hall, J. Garcia); Plaintiff's Exhibit 8(d) (photograph of J. Garcia dancing with Garcia-Montano at the December 9, 2006 wedding).

165.     After the father-daughter dance, J. Garcia immediately went to Presbyterian Hospital. See Apr. 1 Tr. at 59:2-15 (Hall, J. Garcia).

166.     J. Garcia learned that his jaw was broken in several places.  See id. at 59:15-62:4 (Hall, J. Garcia).

167.     J. Garcia had surgery to repair his broken jaw and was in the hospital for three days. See id. at 61:4-10 (Hall, J. Garcia).

168.     J. Garcia elected to have the surgical procedure done in Albuquerque, and underwent surgery that required having his jaws wired shut and his teeth fixed.  He woke up with staples and stitches under his chin.  See id. at 59:16-63:22 (Hall, J. Garcia); Plaintiff's Exhibit 1 (J. Garcia's

medical records); Plaintiff's Exhibit 8(e), 8(f), & 8(g) (photographs of J. Garcia in his hospital bed with bandages and stitches).

169.    J. Garcia has a permanent scar from the surgery under his chin.  See Apr. 1 Tr. at 64:4-12 (Hall, J. Garcia); Plaintiff's Exhibit 8(i) (photograph of the scar).

170.    By the time of the wedding in 2006, J. Garcia managed the pain from the injuries he sustained in 2000 reasonably well.  See Apr. 1 Tr. at 66:3-25 (Hall, J. Garcia).

171.    J. Garcia's pain from the broken jaw was different from his painful decade starting with the 2000 crushing injury, from which he lost his right arm.  The pain associated with the broken jaw was more of a burning or stinging, as if the jaw was on fire.  See id. at 64:20-65:12 (Hall, J. Garcia).

172.    J. Garcia had a ringing in his ears from the pain associated with his jaw injury.  See id. at 65:13-14 (Hall, J. Garcia).

173.    After the surgery that wired shut J. Garcia's jaw and screwed a plate to his jaw bone, J. Garcia took all food and medicine in liquified form, including all pills he took as part of the pain-management scheme relating to his 2000 injuries and all medication related to the jaw surgery.  See id. at 69:11-70:6 (Hall, J. Garcia); id. at 80:18-93:18 (Richards, J. Garcia); id. at 29:19-31:25 (Richards, Garcia-Montano).

174.    Rather than go on her planned honeymoon, Garcia-Montano stayed in the hospital room with J. Garcia for three days, sleeping there.  See Apr. 1 Tr. at 20:22-21:4 (Hall, Garcia-Montano).  She also spent time having numerous talks with medical personnel about home health care for her father.  See id. at 21:7-15 (Hall, Garcia-Montano).

175.    J. Garcia was eventually released to Garcia-Montano's home, where he stayed for about two weeks.  See id. at 21:20-21 (Hall, Garcia-Montano).

176.    During J. Garcia's stay at the Garcia-Montano residence, Garcia-Montano slept with her father to make sure he did not asphyxiate, and had a syringe and wire cutters nearby in case he began choking.  See id. at 21:22-23:1 (Hall, Garcia-Montano).

177.    During those weeks, J. Garcia was in tremendous pain and sweated profusely.  See id. at 24:3-9 (Hall, Garcia-Montano).

178.    While the medication eased J. Garcia's pain somewhat, it did not take the pain away entirely.  See id. at 25:5-12 (Hall, Garcia-Montano).

179.    J. Garcia cried from his suffering.  See Apr. 1 Tr. at 27:10-14 (Hall, Garcia-Montano).

180.    J. Garcia went home to Kansas City, Missouri, for Christmas to be with his wife and their twelve-year-old daughter, but returned to Albuquerque because he needed full-time care that could only come from his adult daughters.  See id. at 60:1-22 (Hall, J. Garcia); id. at 28:2-3 (Hall, Garcia-Montano)(clarifying that the location in Kansas City is in Kansas City, Missouri, rather than Kansas City, Kansas).

181.    J. Garcia moved into the home of Erin Garcia -- his older daughter -- for approximately ten weeks.  See id. at 129:20-130:1 (Hall, E. Garcia).

182.    E. Garcia and her husband put J. Garcia on the couch, and they moved a mattress to the floor next to the couch so that they could be nearby.  See id. at 130:2-15 (Hall, E. Garcia).

183.    E. Garcia insisted on being near J. Garcia because he was in a lot of pain, and she was afraid that, if he choked, she needed to have immediate access to the wire cutters.  See id. at 130:2-15 (Hall, E. Garcia).

184.    J. Garcia was unable to drive because of the excruciating daily pain.  See Apr. 1 Tr. at 131:3-10 (Hall, E. Garcia).

185.    The daily pain did not subside over the ten weeks that J. Garcia lived with E. Garcia. See id. at 131:11:14 (Hall, E. Garcia).

186.    To attend to her father, E. Garcia took leave from her job for about four weeks until the arch bars[8] were removed, and then worked nights while her husband worked days for the rest of the time J. Garcia was there, so that someone was always near J. Garcia.  See id. at 132:1-20 (Hall, E. Garcia).

187.    E. Garcia liquified food about four-to-five times per day, see id. at 132:24-133:8 (Hall, E. Garcia), and medicine three times per day, see id. at 133:9-15 (Hall, E. Garcia).  She changed his sheets about three times per day because of his profuse sweating.  See id. at 135:6-16 (Hall, E. Garcia).

188.    As a result of this twenty-four-hour care, J. Garcia's pain ebbed and flowed.  See Apr. 1 Tr. at 133:16-21 (Hall, E. Garcia).

189.    J. Garcia ate through a straw until March of 2007, and, as a result, lost approximately forty pounds.  See id. at 68:7-19 (Hall, J. Garcia); Plaintiff's Exhibit 5 (J. Garcia's X-rays).

190.    J. Garcia's jaw was wired shut for six-and-one-half weeks, but he could communicate by mumbling words.  See Apr. 1 Tr. at 71:9-14 (Hall, J. Garcia); Plaintiff's Proposed Findings and Conclusions ¶ 79, at 13 (clarifying that this arch bars were removed in January, and not March as Mr. Hall's question indicated).

191.    On January 24, 2007, doctors removed the arch bars from J. Garcia's jaw.  See Plaintiff's Exhibit 3.  J. Garcia described this procedure as also very painful.  See id. at 70:11-71:8

----

[8] An arch bar is "any one of various types of wires, bars, or splints that conform to the arch of the teeth and are used in the treatment of fractures of the jaws and their supporting structures in the stabilization of injured teeth."  Mosby's Medical Dictionary (8th ed. 2009), available at http://medical-dictionary.thefreedictionary.com/arch+bar (last visited June 10, 2010).

(Hall, J. Garcia).

192.   Although the wires were removed earlier, J. Garcia was still unable to chew hard foods like meat or corn until the summer of 2007.  See Apr. 1 Tr. at 72:3-17 (Hall, J. Garcia).

193.   J. Garcia was prescribed a Fentanyl patch[9] after he broke his jaw to replace the pain medication he was previously taking.  See id. at 79:5-7 (Richards, J. Garcia).

194.   J. Garcia developed mood swings as a result of the jaw injuries and medications, including feelings of anger, sadness, and loneliness.  See id. at 72:18-23 (Hall, J. Garcia).

195.   The jaw injury aggravated J. Garcia's PTSD.  See id. at 72:24-73:9 (Hall, J. Garcia).

196.   At some point after he broke his jaw, J. Garcia was taken off Effexor – the anxiety medication that he took to alleviate his PTSD symptoms -- because he had been taking it too long and it was causing him to be scared and experience feelings of loneliness and sadness.  See id. at 73:6-9 (Richards, J. Garcia); id. at 77:9-23 (Richards, J. Garcia).

197.   J. Garcia suffered daily headaches after the surgery on his jaw.  That symptom lingered to various degrees over the next couple of years.  See Apr. 1 Tr. at 74:22-75:4 (Hall, J. Garcia).

198.   The medications related to the jaw pain had no effect, while the chronic pain condition caused by the 2000 work injury was controlled; the jaw pain was observably different.  See id. at 147:22-149:8 (Richards, E. Garcia).

199.   J. Garcia was in severe pain for about twelve weeks, but it progressively improved as summer approached; his suffering lasted for approximately four months. See id. at 116:18-118:17

_____

[9] Fentanyl is "[a] narcotic analgesic used in combination with other drugs before, during, or following surgery," The American Heritage Dictionary of the English Language at 672 (3d ed. 1992), i.e., a pain-reliever, see id. at 65 (defining analgesic).  The patch is a delivery system by which the drug is absorbed through the patient's skin.

(Richards, J. Garcia).

200.    In addition to intense pain and suffering, J. Garcia suffered a loss of enjoyment of life for at least the four months of intensive care by his daughters into March of 2007.

201.    Other than his periodic headaches, J. Garcia's injuries, including the pain, had resolved by June or July of 2007, and he was able to eat normally at that time. See id. at 116:18-118:17 (Richards, J. Garcia).

202.    By the summer of 2007, J. Garcia had recovered from the injuries related to the broken jaw and was back to the pain-management regimen related to his 2000 construction accident. See id. at 75:23-76:1 (Richards, J. Garcia).

203.    Of the medical bills, after Medicare made payments, J. Garcia owed $952.00 on a bill for $21,711.00, see Plaintiff's Exhibit 2 (a bill from Presbyterian Hospital to J. Garcia for $952.00), owed $773.84 on a bill for $3,840.00, see Plaintiff's Exhibit 4 (a bill from OMS Assoc. of New Mexico to J. Garcia for $773.84), owed $62.77 on a bill for $1,558.00, see Plaintiff's Exhibit 6 (a bill from Anesthesia Associates of New Mexico, P.C. to J. Garcia for $62.77), and owed $1,165.04 for prescriptions or purchasing liquid forms of medicines, regardless whether needed for pre-existing conditions, see Plaintiff's Exhibit 7 (receipts for prescriptions totaling $1,165.04); Apr. 1 Tr. at 82:2-11 (Richards, J. Garcia).

204.    Medicines that J. Garcia had been taking for the 2000 injuries had to be liquified, a step that he would not have had to take if his jaw had not been injured.

205.    J. Garcia owed or paid $2,953.65 in uninsured medical expenses, and debt collectors were soon contacting him seeking payment of these bills. See id. at 74:5-9 (Hall, J. Garcia).

## CONCLUSIONS OF LAW

1.    In a tort action against the United States, the court reaches the question whether the

-30-

United States is liable for breaching some duty of care under state law if and only if the court can first find an applicable waiver of sovereign immunity by the United States.  See Sydnes v. United States, 523 F.3d 1179, 1184 (10th Cir. 2008)("[W]e reach the question whether the federal government is liable for breaching some duty of care under state law if (and only if) we can first find an applicable waiver of sovereign immunity by the federal government itself.").

**I.    B. GARCIA WAS IN THE SCOPE OF EMPLOYMENT, AND THUS THE FTCA
WAIVED THE UNITED STATES' SOVEREIGN IMMUNITY.**

2.     Under the FTCA, the district court has jurisdiction over claims against the United States for money damages for personal injuries caused by the negligent or wrongful acts or omissions of any employee of the United States, committed while that employee was acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the plaintiff in accordance with the law of the place where the acts or omissions occurred.  See 28 U.S.C. § 1346(b)(1).

3.     In 1990, Congress extended the FTCA waiver of sovereign immunity to allow the United States to be sued in tort for the tortious conduct of tribal employees that occurred in the performance of an Indian Self-Determination Act contract.  See Pub. L. 101-512, Section 314, 104 Stat. 1915, 1960 (stating that tribal employees working pursuant to a self-determination agreement "are deemed employees of the Bureau or Service while acting within the scope of their employment in carrying out the contract or agreement.").  See also Plaintiff's Exhibit 10 (contract in effect December 2006).

4.     Tort claims against tribes or their employees, acting within the scope of their employment, and that arise out of the tribe's self-determination contract, are considered claims against the United States and are covered to the full extent of the FTCA.  See Hinsley v. Standing

Rock Child Protective Servs., 516 F.3d 668, 672 (8th Cir. 2008); Pub. L. 101-512, Section 314, 104 Stat. 1915, 1960.

5.      Employees of the IPD are considered employees of the United States and covered under the FTCA only to the extent that they are carrying out the terms or functions of the 638 contract at the time of their alleged torts.  See Allender v. Scott, 379 F. Supp. 2d 1206, 1216-17 & n.12 (D.N.M. 2005); Pub. L. 101-512, Section 314, 104 Stat. 1915, 1960.

6.      The law of the place where the alleged negligent conduct took place determines the scope of employment under the FTCA.  See Richards v. United States, 369 U.S. 1, 9 (1962); Williams v. United States, 350 U.S. 857, 857 (1955); Henderson v. United States, 429 F.2d 588, 590 (10th Cir. 1970); 28 U.S.C. § 1346(b).  New Mexico law thus governs whether B. Garcia was acting within the scope of his employment by responding to the disturbance at the St. Augustine Church.

7.      In New Mexico, an employee's acts are within the scope of employment if the act was something fairly and naturally incidental to the employer's business assigned to the employee, and the act was done while the employee was engaged in the employer's business with the view of furthering the employer's interest and did not arise entirely from some external, independent, and personal motive on the part of the employee.  See Cain v. Champion Window Co. of Albuquerque, 142 N.M. 209, 213, 164 P.3d 90, 94 (Ct. App. 2007)(citing NMRA UJI 13-407, at 47 (2008)).

8.      Under New Mexico law, courts apply a four-part test to determine whether an employee was within the course and scope of his or her employment: "[Whether] the action (1) is the kind the employee is employed to perform; (2) occurs during a period reasonably connected to the authorized employment period; (3) occurs in an area reasonably close to the authorized area, and (4) is actuated, at least in part, by a purpose to serve the employer."  Narney v. Daniels, 115 N.M. 41, 49, 846 P.2d 347, 355 (1992).

9.      Scope of employment is an issue of fact that a fact-finder must resolve in each case
in light of its particular facts.  See Nabors v. Harwood Homes, Inc., 77 N.M. 406, 407-08, 423 P.2d
602, 603 (1967); Medina v. Fuller, 126 N.M. 460, 465, 971 P.2d 851, 856 (Ct. App. 1998).

10.      B. Garcia identified himself as an Isleta Police Officer after J. Garcia pushed him,
and B. Garcia identified himself as such to diffuse the situation.  B. Garcia acted because the other
guests at the wedding reception he was attending looked to him to intervene in the brewing dispute
because he was a police officer.  B. Garcia had already instructed J. Garcia to leave the area and
begun escorting him out.  When J. Garcia advanced on B. Garcia, B. Garcia used a technique learned
during his official federal law-enforcement training to take J. Garcia down.

11.      Isleta police officers have a duty to maintain security for all residents and persons
within the Isleta Indian Reservation, including at St. Augustine Church.

12.      The IPD, while it recommended that an off-duty police officer contact an on-duty
officer to deal with disorderly conduct or other minor disturbances, left it up to B. Garcia's
discretion whether to respond.  See Apr. 1 Tr. at 276:5-19 (Vollmann, Gibson); id. at 199:20-200:3
(Hall, Alvarez).

13.      B. Garcia's action -- intervening to settle a verbal dispute that had a risk of escalating
to a breach of the peace -- was of the kind that he is employed to perform as a police officer.

14.      B. Garcia's action occurred at or near the time in which he would be performing his
duties as a police officer.  B. Garcia reported to work less than two hours later.

15.      B. Garcia's action occurred on the Isleta Pueblo, where he has jurisdiction when
acting as a police officer.  His actions were thus performed in an area reasonably close to the
authorized area.

16.      Guests at the wedding reception in the catechism building expected B. Garcia to do

something both because he was the groom's brother and because he was a police officer. Initially, B. Garcia's conduct was based only on an intent to be a good guest and attempt to diffuse a mounting confrontation between his guests of the reception and a stranger. By the time B. Garcia identified himself as a police officer, however, his conduct was "actuated, at least in part, by a purpose to serve the employer." Narney v. Daniels, 115 N.M. at 49, 846 P.2d at 355. When B. Garcia told J. Garcia he was a police officer, B. Garcia had concluded that he needed to behave as a police officer to quell the disturbance. At that point, he was acting, at least in part, because it was his duty as a police officer.

17.     Whether the Court has FTCA jurisdiction and whether the United States is liable under the doctrine of *respondeat superior* for B. Garcia's tortious conduct both depend on whether B. Garcia was acting within the scope of his employment.

18.     At the time of the incident, B. Garcia, an employee of the IPD, a 638 contractor with the BIA, was acting within the scope of the 638 contract and within the scope of his employment. As such, he is deemed to be a federal employee covered by the FTCA.

## II.     ALTHOUGH B. GARCIA WAS WITHIN THE SCOPE OF EMPLOYMENT, HE WAS NOT NEGLIGENT OR RECKLESS.

19.     For an act to be negligent, it must be one that a reasonably prudent person would foresee as involving an unreasonable risk of injury to himself or to another, and which such a person, in the exercise of ordinary care, would not do. See NMRA UJI 13-1601, at 217 (2008).

20.     Ordinary care is that care which a reasonably prudent person would use in the conduct of the person's own affairs. What constitutes "ordinary care" varies with the nature of what is being done. In deciding whether ordinary care has been used, the conduct in question must be considered in the light of all the surrounding circumstances. See NMRA UJI 13-1603, at 218

(2008).

21.     Every person has a duty to exercise ordinary care for his or her own safety, others' safety, and to avoid damaging the property of others.  See NMRA UJI 13-1604, at 219 (2008).

22.     J. Garcia has the burden of establishing that: (i) B. Garcia owed him a duty of ordinary care; (ii) B. Garcia breached that duty by failing to act in conformance with that standard of care; and (iii) B. Garcia's negligence caused J. Garcia's injuries.  See Herrera v. Quality Pontiac, 134 N.M. 43, 47-48, 73 P.3d 181, 186 (2003).

23.     The mere happening of the accident which is the subject of this lawsuit does not establish that B. Garcia, or anyone else, was negligent.  See NMRA UJI 13-1616, at 222 (2008).

24.     Neither the fact that damages are sought because of the accident, nor that this lawsuit was filed, establish negligence on the part of any person.  See NMRA UJI 13-1616, at 222 (2008).

25.     Recklessness, in the civil context, is "the intentional doing of an act with utter indifference to the consequences."  Baldonado v. El Paso Natural Gas Co., 143 N.M. 288, 296, 176 P.3d 277, 285 (2007)(quoting Pub. Serv. Co. of N.M. v. Diamond D Constr. Co., 131 N.M. 100, 117, 33 P.3d 651, 668 (Ct. App. 2001)).

26.     J. Garcia was behaving confrontationally toward B. Garcia, and made a movement that reasonably could be seen as threatening and was reasonably seen as threatening.

27.     After identifying himself as a police officer, it was B. Garcia's reasonable perception that J. Garcia was either taking a "hook" at him or pushing him, and B. Garcia, using ordinary care, applied a defensive tactic to deflect the perceived aggression.

28.     J. Garcia was inherently unstable because of his physical condition.

29.     B. Garcia was not aware of J. Garcia's inherent physical instability, and the actions taken by B. Garcia were not actions which a prudent person would foresee as involving an

unreasonable risk of injury to himself or to J. Garcia.

30.     The pre-existing conditions of J. Garcia do not change the standard of care that B. Garcia was required to exercise, because the eggshell-plaintiff doctrine affects only the amount of damages for which a negligent defendant is liable and not the standard of care up to which the defendant's conduct is held.[10]

_____

[10] Throughout the trial, there was some indication that J. Garcia expected to be able to take advantage of the eggshell-skull plaintiff theory because his prior injuries made him more susceptible to the injury he sustained in this case. The eggshell-skull plaintiff doctrine, however, applies only to the plaintiff's damages and not to the defendant's liability or standard of care. See Boroff v. Meijer Stores Ltd., No. 06AP-1150, 2007 WL 944309, at *4 (Ohio Ct. App. 10th Dist. Mar. 30, 2007)("The 'thin-skull' or 'eggshell' plaintiff theory has no bearing on duty or causation -- it applies only to the extent that when a tortfeasor proximately caused the plaintiff's damages, the tortfeasor is liable for any superfluous damages resulting from the plaintiff's abnormal frailty or pre-existing condition."); Fleming v. Multnomah County, No. CIV 03-462-MO, 2004 WL 1211924, at *4 n.2 (D. Or. June 1, 2004)("The 'eggshell' doctrine . . . cannot be used to answer the threshold question of whether the officer's conduct violated the Eighth Amendment.  That doctrine might aid a . . . plaintiff's proving the extent of harm for which an officer, whose conduct in fact did run afoul of the Eighth Amendment, is liable."); Restatement (Second) of Torts § 461 (1965)("A negligent actor must bear the risk that his liability will be increased by reason of the actual physical condition of the other toward whom his act is negligent.")(emphasis added); NMRA UJI 13-1802, at 256 (2008)("[T]he defendant is said to 'take the plaintiff as he finds [him or her],' meaning that the defendant, if liable, is responsible for all elements of damages caused by the defendant's conduct even if some of the plaintiff's injury arose because the plaintiff was unusually susceptible to being injured.")(emphasis added).  For example, if a person had osteogenesis imperfecta – a genetic disorder that causes an individual to have extremely brittle bones -- and a defendant negligently caused a car accident with that person, the defendant would be liable for all damages arising out of that car accident.  The fact that the person with osteogenesis imperfecta would be more severely injured than a person who did not have that disorder is not factored into the damages equation.  Instead, the defendant takes his plaintiff as he finds him.  The rule does not, as J. Garcia might prefer, increase the standard of care that a person must exercise with respect to the plaintiff.  No matter the condition of the plaintiff, a defendant is required only to act in an objectively reasonable way based upon information known to him.  See Madsen v. Scott, 128 N.M. 255, 260, 992 P.2d 268, 273 (1999)("[I]n New Mexico foreseeability of an injury or harm is an element of negligence, and that foreseeability is that which is objectively reasonable to expect, not merely what might conceivably occur.")(internal citations and quotations omitted); Chavez v. Desert Eagle Distrib. Co., 141 N.M. 116, 122-23, 151 P.3d 77, 83-84 (Ct. App. 2006).  Unless there was a reason for B. Garcia to know that J. Garcia was particularly unstable or prone to injury -- which there was not -- the Court will not hold B. Garcia to a greater-than-ordinary standard of care.

31.     B. Garcia was not negligent -- either in the decision to use the defensive technique or in its execution -- when he deflected J. Garcia into an upright pole, which likely broke J. Garcia's jaw and caused his injuries and damages.

32.     B. Garcia did not act recklessly toward J. Garcia.

33.     That J. Garcia was injured does not establish that B. Garcia was negligent or reckless.

34.     B. Garcia successfully ended the disturbance by removing J. Garcia from the foyer area and was not negligent or reckless in the manner in which he quelled the disturbance.

35.     B. Garcia did not breach a duty of care that he owed to J. Garcia, i.e., B. Garcia was not negligent or reckless.

## III.    B. GARCIA DID NOT COMMIT ASSAULT, BATTERY, OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST J. GARCIA.[11]

36.     New Mexico courts have acknowledged that "the elements of civil and criminal assault and battery are essentially identical." New Mexico v. Ortega, 113 N.M. 437, 440, 827 P.2d 152, 155 (Ct. App. 1992).

37.     Under New Mexico law, one commits battery when "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results." Desmare v. New Mexico, No. CIV 07-0199 JB/RHS, 2007 WL 5231690, at *4 (D.N.M. Aug. 14, 2007)(Browning, J.)(quoting Restatement (Second) of Torts § 18 (1965)).

38.     New Mexico law defines criminal assault as "an attempt to commit a battery" or "any

---

[11] Throughout the course of the trial, it appeared as though J. Garcia might be abandoning all of his intentional tort theories and putting all of his eggs in the negligence basket. Moreover, neither party provided the Court with proposed findings of fact or conclusions of law dealing specifically with these claims. The Court nevertheless resolves the factual issues and finds that J. Garcia is not entitled to recover on any of these theories based on the evidence he introduced.

unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery." NMSA 1978, § 30-3-1 (1963).

39.    J. Garcia conceded during the trial that all of the facts in the complaint regarding his assault and battery allegations are false.  See Apr. 1 Tr. at 121:1-6 (Hall, J. Garcia).

40.    B. Garcia made contact with J. Garcia, and that contact resulted in J. Garcia's harmful contact with the wooden pillar of the catechism building.

41.    B. Garcia did not intend to cause harmful or offensive contact with J. Garcia.

42.    B. Garcia did not intend to assault or batter J. Garcia.

43.    B. Garcia had a privilege to use reasonable force to protect himself from what he reasonably perceived to be an attempted battery by J. Garcia.  See Restatement (Second) of Torts § 63 (1965)("An actor is privileged to use reasonable force . . . to defend himself against unprivileged harmful or offensive contact or other bodily harm which he reasonably believes that another is about to inflict intentionally upon him").

44.    B. Garcia did not commit assault or battery against J. Garcia.

45.    Under New Mexico law, a person commits the tort of intentional infliction of emotional distress when four elements are met: "(1) the conduct in question was extreme and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the claimant's mental distress."  Trujillo v. N. Rio Arriba Elec. Co-op, Inc., 131 N.M. 607, 616, 41 P.3d 333, 342 (2001).

46.    B. Garcia's conduct was not extreme or outrageous; rather, B. Garcia's conduct was reasonable.

47.    While B. Garcia's conduct was intentional, he did not intend to harm J. Garcia.

48.     B. Garcia's conduct was not reckless.

49.     J. Garcia suffered physical anguish and some mental distress resulting therefrom, but his distress was not extreme and severe.

50.     Because B. Garcia did not intend to cause J. Garcia emotional distress through his actions, because his actions were not extreme or outrageous, and because J. Garcia did not suffer extreme and severe mental anguish, B. Garcia did not commit intentional infliction of emotional distress against J. Garcia.

## IV.     THE UNITED STATES IS NOT VICARIOUSLY LIABLE FOR B. GARCIA'S CONDUCT BECAUSE B. GARCIA DID NOT COMMIT A TORT.

51.     The United States is not liable for B. Garcia's actions or omissions under the doctrine of respondeat superior.

52.     The doctrine of respondeat superior allows a plaintiff to impose upon a defendant liability for the tortious acts of his or her employees, see Madsen v. Scott, 128 N.M. 255, 257-58, 992 P.2d 268, 270-71 (1999)("This Court has noted that '[p]rinciples of respondeat superior apply when the claim is based in tort and the plaintiff alleges the employer is liable for the conduct of an employee because the employee was acting within the scope of employment.'")(quoting Romero v. Mervyn's, 109 N.M. 249, 254, 784 P.2d 992, 997 (1989)); therefore, if the employee does not behave tortiously, there is no liability to impose upon the employer.

53.     B. Garcia's conduct with respect to J. Garcia on December 9, 2006, does not fall within the discretionary-function exception in the FTCA, because nothing about B. Garcia's conduct, or in the day-to-day exercise of law enforcement judgment, suggests that it reflected public policy considerations on behalf of the IPD or of the BIA.  See Garcia v. United States, No. CIV 08-0295 JB/WDS, 2010 WL 1631582, at **14-15 (D.N.M. Apr. 5, 2010)(Browning, J.).

54.     Nevertheless, because B. Garcia did not commit any tortious acts against J. Garcia, the United States is not vicariously liable.

## V.     J. GARCIA IS NOT ENTITLED TO RECOVER DAMAGES.

55.     The United States is not liable for the injuries that J. Garcia suffered.

56.     J. Garcia is not entitled to compensation for pain and suffering, or for a temporary loss of enjoyment of life.

57.     J. Garcia is not incidentally entitled to compensation for his uninsured medical costs.

58.     Judgment should be entered in favor of the United States and against J. Garcia.

**IT IS ORDERED** that Defendant United States of America is not liable to Plaintiff John David Garcia for any of the injuries he suffered arising out of the December 9, 2006 incident.


_____
UNITED STATES DISTRICT JUDGE



*Counsel and parties*:

Robert B. Martinez
Albuquerque, New Mexico

-- and --

Timothy A. Vollman
Albuquerque, New Mexico

-- and --

Brad D. Hall
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

-40-

Gregory J. Fouratt
   United States Attorney
Jan Elizabeth Mitchell
   Assistant United States Attorney
Dori Ellen Richards
   Special Assistant United States Attorney
Albuquerque, New Mexico

   *Attorneys for Defendant United States of America*

Ben Garcia
Albuquerque, New Mexico

   *Defendant pro se*